***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award of the Deputy Commissioner. The Full Commission AFFIRMS the Opinion and Award of the Deputy Commissioner with some modifications and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. At all times relevant to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between the plaintiff-employee and the defendant-employer.
3. The defendant-employer is a duly qualified self-insured.
4. Should this claim be deemed compensable, plaintiff's agreed average weekly wage is $655.00, and his compensation rate is $436.66 per week.
5. The following were entered into the evidence of record at the hearing before Deputy Commissioner Stephenson:
a. Stipulated Exhibit #1 — Pretrial Agreement
b. Stipulated Exhibit #2 — Industrial Commission Forms 18, 33 and 61
c. Stipulated Exhibit #3 — plaintiff's medical records including supplemental pages 16-A through 16-I
d. Stipulated Exhibit #4 — disability forms
e. Stipulated Exhibit #5 — photograph of plaintiff's back
f. Stipulated Exhibit #6 — photographs of the drill and the accident scene
g. Stipulated Exhibit #7 — a safety alert prepared by defendant-employer regarding plaintiff's accident, and for which defendant-employer stipulates to the authenticity
h. Stipulated Exhibit #8 — defendant-employer's authorization for plaintiff's medical treatment
i. Stipulated Exhibit #9 — a letter from Joel D. Barber to plaintiff dated July 24, 2002
j. Stipulated Exhibit #10 — plaintiff's answer to defendant's first set of interrogatories
k. Stipulated Exhibit #11 — plaintiff's employment file with defendant-employer
l. Stipulated Exhibit #12 — a letter from plaintiff's counsel to the Industrial Commission dated August 21, 2002
m. Stipulated Exhibit #13 — a letter from plaintiff's counsel to Truman Chidsey dated August 21, 2002
n. Stipulated Exhibit #14 — a letter from plaintiff's counsel to defendant's counsel dated October 10, 2002
o. Stipulated Exhibit #15 — softball documents
19. Plaintiff contends the contested issues to be tried by the Industrial Commission are as follows:
(a) Did plaintiff sustain a compensable back injury while working for defendant-employer April 17, 2002?
(b) Is plaintiff entitled to temporary total disability from July 8, 2002 when he last worked for defendant-employer, and continuing thereafter?
(c) Is plaintiff entitled to have defendant-employer pay for medical treatment previously provided him by Dr. Hall, Dr. Moore, Dr. Moyle, Dr. Chokski and Dr. McQueen?
(d) Is plaintiff entitled to have defendant-employer pay for continuing medical treatment provided by Dr. Moyle, Dr. Chokski and Dr. McQueen?
(e) Is plaintiff entitled to reasonable attorney's fees under N.C. Gen. Stat. § 97-88.1 for defendant-employer's defense of this claim without reasonable ground?
(f) Should sanctions and/or penalties be imposed upon defendant-employer for: (i) failure to prepare and file Industrial Commission Form 19; (ii) failure to prepare and file Industrial Commission Form 33R; and/or (iii) failure to respond to plaintiff's request under Rule 607 for production of employment and medical records in defendant-employer's custody or control.
(g) If defendant-employer is permitted a credit for short-term disability payments made to plaintiff, should the credit be reduced by attorney's fees?
20. Defendant-employer contends the contested issues to be tried by the Industrial Commission are as follows:
(a) Whether plaintiff's disability was caused by an alleged accident on April 17, 2002 where plaintiff continued to play softball and other activities, but did not develop symptomatic degenerative disc disease problems until sometime in July 2002?
(b) Are defendants entitled to a credit for short-term disability payments made?
 ***********
Based upon all the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff was born November 12, 1954, and was 48 years of age at the time of the Deputy Commissioner hearing. He attended school through the eleventh grade, and received his GED.
2. At the time of the hearing before the Deputy Commissioner, plaintiff was an employee of defendant-employer Vulcan Materials, but was on medical leave. He last worked for defendant on July 8, 2002, and has not worked anywhere or earned wages since July 8, 2002. Plaintiff first went to work for defendant on November 16, 1998, and as of November, 2003 he was a five-year employee.
3. Defendant is in the business of drilling, blasting and crushing rock. Plaintiff's job for defendant was a drill operator, which involves drilling holes into rock on the edge of a cliff, and which also involves driving a truck. The drill operator must step up four steps and walk down a runway to enter the cabin where the operator sits.
4. On Wednesday, April 17, 2002 around 8:00 a.m. to 8:30 a.m., it became plaintiff's job to drill holes into the face of rock on the edge of a cliff. The cliff was 70 feet tall. The drill in which plaintiff sat to perform his work was perched on the edge of the cliff, and his seat was over the edge of the cliff. The drill itself was raised approximately a foot to a foot-and-a-half above a track. Photographs accurately depicting the drill, the track and the cliff were admitted into evidence as Stipulated Exhibit #6. The photographs of the drill in which plaintiff was sitting at the time of the incident were taken by defendant after the drill dropped down onto its tracks, as described below.
5. On April 17, 2002 plaintiff was drilling a hole when a large part of the face cracked and gave way, causing the drill to lurch forward and suddenly drop approximately one foot to one and a half feet on its track. When the drill dropped onto the track, it slammed plaintiff down in his seat. Fearing that he and the drill would fall over the cliff, plaintiff jumped up, ran out of the cab down a runway on the drill and jumped. Plaintiff landed feet first but then fell back onto the ground, landing on his back and the right side of his back. Plaintiff then jumped up and ran.
6. Defendant was immediately made aware of the incident and completed an investigation. On the same day his injury was sustained, plaintiff reported his back pain to Brian Moore, defendant's district safety manager, and also to his supervisor, Fred Cloninger. Plaintiff told both men that he had injured his back and that he thought he had landed wrong and twisted a muscle in his back.
7. Despite his pain, plaintiff did not request medical treatment and worked the rest of his shift, mainly just standing around. In fact, plaintiff told Mr. Moore and Mr. Cloninger that he did not want to go see a doctor. As found below, plaintiff's primary concern was the company's safety record.
8. That night at home, plaintiff's right leg began to hurt. The above incident happened on a Wednesday, and plaintiff worked Thursday and Friday. Plaintiff informed Mr. Cloninger two days after the injury that his right hip was painful and plaintiff felt he had injured it when he jumped from the drill.
9. Approximately two weeks later, plaintiff for the first time told Mr. Cloninger that he thought he should go see a doctor. Plaintiff was taking non-prescription pain relievers at work during this period of time. Plaintiff testified that after the first two weeks, Mr. Cloninger went to the break room to get non-prescription pain relievers for plaintiff which was corroborated by Mr. Cloninger. The break room was approximately one-half mile from the pit where plaintiff and other employees worked.
10. During the six-week period of time following his injury, plaintiff's low back pain and right leg pain continued to worsen. Plaintiff again told Mr. Cloninger that he needed to go to a doctor, but did not want to "put it on worker's compensation, that I would just put it on my insurance if there was nothing bad wrong with my back." Mr. Cloninger told plaintiff that he should speak with the plant superintendent, Charles Heatherly.
11. Plaintiff then spoke with Mr. Heatherly. Plaintiff told Mr. Heatherly that he "didn't want to put it on worker's comp, that I would like to just, if there was nothing wrong with my back serious, that I'd just put it on my insurance and let it go at that because we had about a 42-month safety record in the pit." Plaintiff's concern for the safety record was compounded by his realization that the last at-work injury 42 months previous was his. Two weeks after he started working for defendant, plaintiff cut his leg on a bolt on the drill and received medical treatment. There had been no accidents at work since then.
12. Plaintiff saw Dr. Daniel C. Hall on May 30, 2002 and gave a history of sharp right lower back pain with radiation into the right leg occurring "after jumping off a drill at work, when he fell 8-10 feet and landed on his feet, but fell partially to his right side." Plaintiff's complaint of low back pain at that time was 8 on a 10-point scale. Dr. Hall diagnosed "low back pain, etiology undetermined," prescribed several medications for plaintiff's back pain and gave him an appointment to return in a week.
13. Plaintiff was on a softball team sponsored by defendant and after the injury by accident he participated in softball games on May 19, 2002, May 26, 2002 and June 2, 2002. Participation on the softball team was voluntary and was not within the scope of plaintiff's employment. Plaintiff participated on the team with his wife and son.
14. Mr. Cloninger testified at the hearing before the Deputy Commissioner that at the game on June 2, 2002 plaintiff batted, ran to first base, and fell to his knees complaining of back pain. Mr. Cloninger then said plaintiff was helped off the field and soon thereafter left the ballpark due to his back pain. Mr. Cloninger's testimony, however, was contradicted by plaintiff, his wife, his son and a team member, Gerald Caulder. The Full Commission gives little weight to Mr. Cloninger's testimony concerning plaintiff's behavior at this ballgame.
15. Robert Callahan is an employee of defendant and plaintiff's neighbor. Mr. Callahan testified that every other week from October 2002 to April 2003 he observed horse tracks on the dead-end dirt road where he and plaintiff live. However, Mr. Callahan testified that he never observed plaintiff riding a horse, but had only observed horse tracks. Defendant also presented testimony that plaintiff had been observed dressed in hunting clothes on one occasion.
16. Plaintiff returned to Dr. Hall on June 10, 2002. Plaintiff's reported back pain was 4 on a 10-point scale. Dr. Hall assessed plaintiff as having low back pain with no improvement, approved him for light-duty work with no lifting more than ten pounds until an orthopaedic evaluation.
17. On June 13, 2002 plaintiff came under the care of Dr. John R. Moore, an orthopaedic surgeon who practices at Pinehurst Surgical Clinic in Pinehurst. Plaintiff gave Dr. Moore a history of having injured his right hip and low back at work on April 27, 2002 when he jumped out of a drilling rig a distance of at least four-and-a-half feet off the ground. Plaintiff told Dr. Moore that he experienced immediate pain.
18. Dr. Moore diagnosed low back pain with right-sided radicular pain, prescribed medication, arranged for physical therapy, and restricted plaintiff to no lifting greater than 20 pounds and no stair climbing until his return appointment.
19. Plaintiff returned to Dr. Moore on July 2, 2002, but his condition had worsened, and was more painful with any lifting or weight bearing. Dr. Moore found that plaintiff exhibited decreased sensibility in the distribution of the L5 nerve root on the right side. Dr. Moore renewed plaintiff's prescription for Lortab, a narcotic, and ordered an MRI.
20. On July 8, 2002, which was plaintiff's last day at work, plaintiff got in and out of his drill prior to his lunch break at least twenty to thirty times in an effort to clean out several holes with the drill. Each time plaintiff got in and each time he got out of the drill, he had to step up or down four steps. Prior to July 8, 2002 plaintiff had not climbed in and out of the drill this many times before lunch. That evening at home, his low back and right leg became even more painful. When plaintiff got up the next morning, July 9, 2002 he could hardly move. His wife called defendant, spoke with the plant clerk, John Thompson, and told him that plaintiff was going to the doctor that day.
21. On July 9, 2002, plaintiff gave Dr. Fred D. McQueen, Jr., a family physician, a history of having to jump from the drill at work, causing injury to his lower back, and more specifically gave Dr. McQueen a history of having difficulty climbing up the steps to get on the huge drill. Dr. McQueen noted plaintiff's treatment with Dr. Hall and Dr. Moore, diagnosed lumbosacral disc disease with right leg radiculopathy, noted the MRI which Dr. Moore had scheduled for July 21, 2002 and took plaintiff out of work on a medical leave-of-absence until the next appointment which was July 29, 2002.
22. Defendant paid for plaintiff's medical treatment. Following plaintiff's visit to Dr. McQueen, he received a letter from defendant's claims supervisor, Joel D. Barber, dated July 24, 2002. This letter stated that plaintiff's treatment with Dr. McQueen was not covered under the worker's compensation claim, but it also re-affirmed that his treatment with Dr. Hall and Dr. Moore was covered.
23. Plaintiff returned to Dr. Moore July 26, 2002. Plaintiff's low back and right-sided radicular pain persisted, and he continued to have a positive straight leg raise test on the right and negative straight leg raise test on the left. Plaintiff's MRI was interpreted as showing degenerative disc disease, but no evidence of focal disc herniations. Dr. Moore took plaintiff out of work altogether on July 26, 2002, and ordered a bone scan and copied the clinic note to Dr. McQueen.
24. On August 2, 2002, Dr. Moore reviewed the bone scan he had ordered and noted that it showed degenerative changes at the L4-5 level on the right side. Dr. Moore stated that these changes accounted for his current symptoms. Dr. Moore referred plaintiff to his partner at the Pinehurst Surgical Clinic, Dr. Henry Moyle, a neurosurgeon.
25. Plaintiff had previously treated with Dr. Moyle for neck pain for which a cervical MRI disclosed a disc herniation at C3-4. Plaintiff treated with Dr. Moyle for this condition from September 11, 2001 until January 25, 2002, just three months prior to the compensable low back injury. During his treatment with Dr. Moyle for his neck pain, plaintiff at no time complained of low back pain or any symptoms into his right leg. In fact, Dr. Moyle examined plaintiff's lumbar spine and lower extremity on a number of occasions and found that he had no evidence of any lumbar condition. Dr. Moyle specifically found that plaintiff had normal gait and station and had 5/5 strength in all muscle groups with respect to the lower extremities.
26. Despite the fact that plaintiff was referred to Dr. Moyle by Dr. Moore, an authorized treating physician, defendant denied further treatment by Dr. Moyle. Plaintiff's health insurance picked up Dr. Moyle's care January 8, 2003.
27. Defendant authorized a lumbar mylegram on December 18, 2002, which showed a likely bulging disc at L4-5. Dr. Moyle noted the mylegram showed a broad based disc at L4-5, which might be affecting either the L4 or L5 nerve root. Plaintiff exhibited sensory deficits and a positive straight leg raise test on the right. Dr. Moyle recommended a right-sided root sleeve injection.
28. The right L5 nerve root sleeve injection was performed January 20, 2003. Plaintiff exhibited marked improvement post-procedure, and the study showed a likelihood that the right L5 nerve root sleeve distribution was responsible for a considerable amount of plaintiff's pain. Plaintiff then returned to Dr. Moyle February 10, 2003. Dr. Moyle agreed that the significant relief plaintiff experienced from the root sleeve injection indicated that the L5 root was causing his pain. Dr. Moyle then discussed surgery with plaintiff and noted that plaintiff would have a 50-60% chance of improvement with surgery. Plaintiff wanted to proceed with the microdiscectomy procedure Dr. Moyle had recommended.
29. Prior to proceeding with surgery, however, Dr. Moyle decided to refer plaintiff for a second surgical opinion to Dr. Rakesh P. Chokshi, an orthopaedic surgeon in Florence, South Carolina.
30. Plaintiff saw Dr. Chokshi on Dr. Moyle's referral on April 3, 2003. Dr. Chokshi took a history of plaintiff's back injury at work, noted plaintiff's severe complaints of pain, tenderness to the paraspinal musculature, and a positive straight test on the right side, but also noted deep tendon normal reflexes and the absence of a significant compressive lesion on the MRI and myelogram. Dr. Chokshi further stated that plaintiff's symptoms were very suggestive of acute radiculopathy but he did not see a clear compressive etiology that would permit him to concur with the microdiscectomy procedure Dr. Moyle was considering. Dr. Chokshi instead recommended EMG nerve conduction studies, consideration of discography, and a new MRI. If the discography were positive, Dr. Chokshi also suggested minimal invasive procedures thereafter, such as IDET or nucleoplasty.
31. Plaintiff thereafter returned to Dr. Moyle on May 7, 2003. In light of Dr. Chokshi's recommendation for a discogram leading to possible fusion surgery, and because Dr. Moyle did not perform discograms or fusions based on discograms, Dr. Moyle referred plaintiff to Dr. James E. Rice. Dr. Moyle also referred plaintiff to the Pain Clinic for management of his chronic lower back pain.
32. Dr. Rice, an orthopaedic surgeon who practices in Pinehurst, North Carolina, first saw plaintiff on May 16, 2003. Dr. Rice's examination of plaintiff revealed tenderness in the right sciatic notch and a positive straight-leg raising test sitting and supine on the right, negative on the left. Dr. Rice recommended lumbar discography to help determine the full etiology of plaintiff's back pain.
33. The discography was performed May 22, 2003, and interpreted by Dr. Rice at the May 30, 2003 appointment. The lumbar discography, according to Dr. Rice's clinic notes and his deposition testimony, demonstrated painful discs at the bottom four lumbar levels. The fact that the disc leaked fluid through annular tears on the left side rather than the right side was not significant in determining the source of an etiology of plaintiff's low back and right leg pain, which Dr. Rice felt was due to damage at the L4-5 disc level on the right side.
34. Dr. Rice concluded that because plaintiff had four level discogenic pain, surgical fusion was not an option. Dr. Rice recommended physical therapy and prescribed Neurotin for relief of plaintiff's painful symptoms. Due to difficulties with increased back pain and physical therapy, the therapist discontinued plaintiff's physical therapy for a period of time. Dr. Rice at the June 20, 2003 appointment felt it would be helpful to reinstitute plaintiff's therapy to try to maximize his back function.
35. Plaintiff remained under Dr. Rice's care through the close of the record and it does not appear from the evidence of record that plaintiff has reached maximum medical improvement. He continued to remain on out-of-work status from Dr. McQueen.
37. The Full Commission finds the greater weight of the credible evidence supports a finding that defendant authorized plaintiff's treatment with Dr. Hall, Dr. Moore, and a portion of his treatment with Dr. Moyle. The plant manager specifically directed plaintiff to Dr. Moore.
38. The Full Commission finds that all of plaintiff's medical treatment provided to him by or at the direction of Dr. Hall, Dr. Moore, Dr. McQueen, Dr. Moyle, Dr. Chokshi and Dr. Rice has been appropriate and necessary in an effort to reduce the period of plaintiff's disability, possibly effect a cure and to alleviate the painful symptoms and reduced mobility he experiences with his lower back and right leg.
39. At the hearing before the Deputy Commissioner, plaintiff expressed his desire to return to work with defendant. Plaintiff was still employed by defendant and was on medical leave of absence authorized by Dr. McQueen and approved by defendant. In fact, Mr. Cloninger testified at the hearing before the Deputy Commissioner that plaintiff was a good employee, that he had excellent performance reviews, and that if plaintiff were "cleared physically," Mr. Cloninger would look forward to plaintiff's return.
40. Mr. Heatherly agreed that plaintiff was a good employee, and he did not disagree with Mr. Cloninger's assessment of plaintiff's various job performances.
41. The Full Commission finds based upon the greater weight of the evidence that plaintiff's treatment and disability resulted from his compensable work related injury on April 17, 2002, rather than from any softball game, hunting, or horseback riding.
42. As a result of plaintiff's compensable injury by accident on April 17, 2002, plaintiff was disabled and has been unable to work or earn wages in any employment since July 8, 2002.
43. Plaintiff received short-term disability pursuant to a company-funded plan.
44. Defendant has not defended this action without reasonable grounds.
45. Defendant failed to file a Form 33R in response to plaintiff's Form 33 Request for Hearing.
 ***********
The foregoing stipulations, findings of fact and conclusions of law engender the following additional:
 CONCLUSIONS OF LAW
1. On April 17, 2002 plaintiff sustained an injury by accident to his back arising out of and in the course of his employment with defendant. N.C. Gen. Stat. § 97-2(6).
2. As a result of this compensable injury, plaintiff was disabled from any employment and is entitled to temporary total disability at his compensation rate of $436.66 per week from July 9, 2002 and continuing until further Order of the Commission. Defendant is entitled to a credit for short-term disability paid. N.C. Gen. Stat. §§ 97-29, 97-42.
3. Plaintiff is entitled to reasonable medical expenses for so long as such examinations, evaluations, and treatments may reasonably be required to effect a cure, give relief or lessen plaintiff's period of disability. N.C. Gen. Stat. § 97-25.
4. The defense of this claim was reasonable and not stubborn, unfounded litigiousness and, therefore, plaintiff is not entitled attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
5. Defendant is subject to sanctions for failure to file a Form 33R, in violation of Rule 603 of the North Carolina Workers' Compensation Rules.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay to plaintiff temporary total disability benefits at his compensation rate of $436.66 per week from July 9, 2002 and continuing until further Order of the Commission. Defendant is entitled to a credit for amounts paid to plaintiff pursuant to the short-term disability plan. Those amounts which have accrued shall be payable in a lump sum.
2. Defendant shall pay all medical expenses incurred by plaintiff as a result of his compensable injury on April 17, 2002.
3. A reasonable attorney's fee of 25% of the compensation due plaintiff is approved for plaintiff's counsel and shall be deducted from any accrued compensation and forwarded directly to plaintiff's counsel. Thereafter, defendant shall forward every fourth compensation check to plaintiff's counsel.
4. Defendant shall pay the costs, including a $25.00 sanction for failure to file a Form 33R.
This the ___ day of June, 2004.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER
LKM/kjd